MELLEN *v.* TOWN OF LANSING.

THOMAS *v.* SAME.

*(Circuit Court, N. D. New York.* February 3, 1882.)

TOWN BONDS IN AID OF RAILROADS.

Under a state law authorizing towns, cities, and villages to issue bonds in aid of railroads or branch railroads passing through the county in which such towns, cities, or villages are situated, where the resolution of the railroad company merely fixed the eastern point, but fixed no location, no counties through which the branch should pass, and no western terminus, it was no location of the branch through a county not designated, and is wholly insufficient to authorize the issuing of any bonds by a town in such county. There is no authority to issue the bonds until the whole extension or branch is located.

*Sprague, Milburn & Sprague* and *James R. Cox,* for plaintiff.

*Harlow L. Comstock,* for defendant.

BLATCHFORD, C. J. This suit is brought on coupons cut from bonds purporting to have been issued by the town of Lansing, in Tompkins county, New York, and bearing date December 1, 1871. The coupons sued on are 47 in number, falling due September 1, 1879, cut from 47 bonds, the principal of which bonds amounts to $38,000, the coupons amounting to $1,330. It was tried once before this court and a jury, and the plaintiff had a verdict, under the direction of the court, for $1,457.59, being the amount of the coupons and interest thereon. The defendant moved for a new trial, on a bill of exceptions containing exceptions taken at the trial. The court, on August 12, 1881,* granted a new trial. The new trial has been had before the court, without a jury.

The first question is as to the statute authority for the issuing of the bonds by the town. By section 1 of the act of April 5, 1871, (Laws of New York, 1871, vol. 1, c. 298, p. 586,) it is provided as follows:

"The New York & Oswego Midland Railroad Company are hereby authorized and empowered to extend and construct their railroad from the city of Auburn, or from any point on said road easterly or southerly from said city, upon such route and location, and through such counties, as the board of directors of said company shall deem most feasible and favorable for the construction of said railroad, to any point on Lake Erie or the Niagara river."

*See *ante,* 820.

Then follow provisions for constructing other branches. Then, follows this:

"And any town, village, or city in any county through or near which said railroad or its branches may be located, except such counties, towns, and cities as are excepted from the provisions of the general bonding law, may aid or facilitate the construction of the said New York & Oswego Midland Railroad, and its branches and extensions, by the issue and sale of its bonds in the manner provided for" in the said act of 1866 and the acts "amendatory of and supplementary thereto."

The act of 1866, referred to, is the act of April 5, 1866, (Laws of New York, 1866, vol 1, c. 398, p. 874.) It provides for the appointment, by the county judge of the county in which the town is situated, of not more than three commissioners to carry into effect the purposes of the act. The commissioners are to execute the bonds under their hands and seals, and to issue them. When issued lawfully, they become the obligations of the town. All the statutes then speak of them as bonds issued by the town.

The bonds in the present case state on their face that they are obligations of the town, and that they are issued under the provisions of the said act of 1866, and the several acts amendatory thereof and supplemental thereto, especially the said act of 1871. The bonds purport to be attested by the hands and seals of three persons, who style themselves therein "duly-appointed commissioners of said town of Lansing;" and the bonds state that they have caused each of the annexed coupons to be signed by one of their number.

The board of directors of the company, on the sixteenth of November, 1871, passed the following resolution:

"Whereas, the New York & Oswego Midland Railroad Company had for its original object the construction of a railway from the city of New York to the city of Oswego; and

"Whereas, since the organization of said railroad company, it has become desirable to extend their said railroad to Lake Erie or the Niagara river; and

"Whereas, the legislature of the state of New York did, by chapter 298 of the laws of 1871, authorize and empower the said New York & Oswego Midland Railroad Company to build and extend their said railroad from the city of Auburn, or from any point easterly or southerly of said city, to any point on Lake Erie or the Niagara river; and

"Whereas, the said railroad company and its board of directors have decided to begin such extension and construction of said railroad westerly, at and from the village of Cortland, in the county of Cortland, and westerly to Lake Erie or the Niagara river; therefore, be it

" Resolved, that the board of directors of said railroad company hereby determine that the construction and extension of the said railroad westerly commence at and from the village of Cortland, in the said county of Cortland, and thence to Lake Erie or the Niagara river."

On the same sixteenth of November, 1871, the board of directors of said company passed the following resolution:

" Resolved, that the said New York & Oswego Midland Railroad Company, for the purpose of obtaining money and materials necessary to extend their said railroad from the village of Cortland to Lake Erie or the Niagara river, hereby authorizes and directs its president and treasurer to borrow money to an amount not exceeding $25,000 per mile in length of the track of the said railroad, so as aforesaid to be extended and constructed, and, to secure the repayment thereof, to issue its first-mortgage bonds, to be made payable in gold coin of the United States, and to be of such denomination, and after such manner and form, and to such trustees, as the said president may determine upon and deem best for the interest of the said company."

On the twenty-first of October, 1871, the county judge of Tompkins county signed a paper appointing as commissioners of said town, to carry into effect the purposes of the said act of 1866, and the acts amendatory thereof, "in accordance with the provisions of the said acts," the three persons who afterwards executed the bonds as commissioners. The commissioners took the oath of office as such on the first of November, 1871.

Some 20 years prior to the year 1872, a road-bed 16 miles long, called the "Murdock Line," intended for a railroad, had been graded. That road-bed ran from a place called Osmuns, in the town of Lansing, northward to the north line of Lansing, which is the south line of the county of Cayuga and of the town of Genoa, in that county, and then northward through Genoa and the town of Venice into the town of Scipio, all in Cayuga county. The grading of that road-bed had become grassed over, and the culverts were decayed. Some part of it was ready for ties and ballasting.

On the first of January, 1871, the executive committee of the railroad company purchased the Murdock line, with its franchises, right of way, and road-bed. During the summer and fall of 1871, surveys were made by the company for a line of road to run from Freeville, in the town of Dryden, Tompkins county, the town next south of Lansing, to the south end of the Murdock line, at Osmuns, in the town of Lansing, a distance of 10 miles. As a result of this acquisition and of these surveys, the bonding proceedings were commenced and the resolutions of November 16, 1871, were passed.

On the thirteenth of December, 1871, there was filed in the office of the clerk of the county of Tompkins a map called "Map No. 1," containing this inscription: "Map and profile of a part of the Auburn branch of the New York & Oswego Midland Railroad, as located in and through a part of the county of Tompkins, New York." This location covers 10 miles in length, from Freeville to the Murdock line, at Osmuns.

On the twenty-second of December, 1871, there was filed in the same office a map called "Map No. 2," containing the same inscription as "Map No. 1." This location is continuous with the preceding, and covers the Murdock line from Osmuns to the north line of the town of Lansing, that being the north line of Tompkins county and the south line of Cayuga county.

On the twenty-third of December, 1871, there was filed in the office of the clerk of the county of Cayuga a map called "Map 1," containing this inscription: "Map and profile of a part of the Auburn branch of the New York & Oswego Midland Railroad, as located in and through a part of the county of Cayuga, New York." This location is continuous with the preceding, and covers the Murdock line from the south line of Genoa, through Genoa and Venice, to the south line of Scipio.

On the thirtieth of May, 1872, there was filed in the last-named office a map called "Map 2," containing the same inscription as "Map 1." This location is continuous with the preceding, and covers the Murdock line from the south line of Scipio to the Merrifield road, in Scipio, which was the north end of the Murdock line.

The grading and making of the road from Freeville, north through the town of Lansing, was begun in December, 1871. There was a railroad already built and running from Cortland to Freeville, west from Cortland, which belonged to the Utica, Ithaca & Elmira Railroad Company. Under some arrangement between that company and the Midland Company the latter began, in the fall of 1872, to run its own cars from Cortland to Freeville, and so on to Scipio; its own road from Freeville to Scipio, 26 miles, having been completed to the north end of the Murdock line. The terminus in Scipio was 11 miles from Auburn, in a farming community, and has never connected there with any other railroad. In resuscitating the Murdock line, the Midland Company put ties and ballast and rails on the whole length of it, and built some culverts and some bridges.

The commissioners issued the bonds of the town and delivered them to Charles P. Wood, the assistant treasurer of the Midland

Company.   None of the bonds were issued before January 31, 1872.
On that day $15,000 were issued; afterwards $60,000 were issued.
In exchange for them the commissioners received a certificate for
750 shares of the stock of the Midland Company, of $100 each, in
the name of the town.

On the twenty-ninth of January, 1873, the following proceedings
took place at a meeting of the board of directors of the Midland Com-
pany:

"The president presented the contract made by the executive committee
with Charles P. Wood, of Auburn, dated January 1, 1871, for the road-bed and
franchises known as the 'Murdock Line.'   On being read and discussed, J. W.
Merchant offered the following:

"Resolved, that the contract made by D. C. Littlejohn, J. W. Merchant,
John R. Clarke, Cheney Ames, and William Foster, as the executive commit-
tee, and Charles P. Wood, of Auburn, for the purchase of the franchises, right
of way, and road-bed known as the 'Murdock Line,' be and the same hereby is
approved, ratified, and confirmed.

"Resolved, that the action of the president, in locating and constructing
the western extension of this company's road over and upon the said 'Mur-
dock Line,' be and the same is hereby approved.   Unanimously adopted."

The persons named were all or a majority of the executive com-
mittee.

The commissioners were appointed before the company passed the
resolutions of November 16, 1871, and before any part of the western
extension was located.   It is contended for the defendant that there
was no power to institute the bonding proceedings before the com-
pany had so located the whole of the branch road that it would pass
through the county of Tompkins, or at least that there was no power
to issue any bonds before such location, and that there was no such
location before the bonds in this case were issued.

Under the act of 1871 the company is authorized to make its
extension or branch to any point on Lake Erie or the Niagara river,
either from Auburn or from some point on its road easterly or south-
erly from Auburn, "upon such route and location, and through such
counties, as the board of directors of said company shall deem most
feasible and favorable for the construction of said railroad."   The
eastern starting point must be fixed by the company, and so must
the route and location, and the counties through which such exten-
sion or branch is to pass, and the western terminus.   No county is
named; no town is named.   Any town in any county through or
near which the railroad or its branch may be located, except as de-

fined, may issue and sell its bonds in aid, in the manner provided for in the prior acts referred to.

By section 3 of the act of May 15, 1867, (Laws of New York, 1867, c. 917, p. 2291,) as amended by section 4 of the act of March 31, 1869, (Id. 1869, c. 84, p. 142,) the company was authorized "to construct a branch railroad from the line of the said road, at any point in the counties of Chenango or Madison, through the counties of Chenango, Madison, Onondaga, Cortland, Cayuga, to the city of Auburn, in the county of Cayuga, whenever, in the judgment of the directors, the same shall be for the interest of said corporation." Then the same power is given to the towns along the line of the said branch road, or interested in the construction thereof, "in any county through which said railroad shall run," to subscribe stock and issue bonds in aid, as is given by the said acts of 1866 and 1867. The branch so mentioned in the acts of 1867 and 1869 is a branch to Auburn. It is not to pass through Tompkins county. No location of it could give any power to the town of Lansing to issue any bonds. The western extension provided for by the act of 1871 might, under that act, have been ordered by the company to start from Auburn, as its eastern terminus, and thus have been a continuation of the said branch to Auburn. As it was, the western extension was ordered by the company, by the resolution of November 16, 1871, to begin at the village of Cortland. That extension had nothing to do with the branch to Auburn or the Auburn branch. The said resolution is, in terms, confined to the extension authorized by the act of 1871.

The resolution merely fixed the eastern point. It fixed no route, no location, no counties through which the branch should pass, no western terminus. It was no location of the branch through the county of Tompkins. It was wholly insufficient, therefore, to authorize the issuing of any bonds by the town of Lansing.

The said maps are relied on as being a location before the bonds were issued, but each of them purports, on its face, to be a location of a part of "the Auburn branch"—that is, the branch to Auburn, which was not to go through Tompkins county. No one of the maps purports to be a location of any part of the western extension.

Moreover, there is an inherent defect, in the fact that the company never, by any action of its directors or otherwise, designated all the counties through which the road was to pass. Under the act of 1871 the whole extension or branch must be located before the bonds of

any town can be issued. It is not enough that a location be made through a particular county. So that, even though the maps filed could be regarded as a location of so much of the western extension as was to pass through Tompkins county, there would be no authority for issuing the bonds until the whole extension or branch should be located. The board of directors must in some way adopt an entire route as feasible and favorable before the town bonds can be issued.

This seems to have been the view of the court of appeals of New York, in *People* v. *Morgan*, 55 N. Y. 587. The absence of such location, under the act of 1871, is as fatal to the bonds, even in the hands of a *bona fide* holder, as if there were no statute. As was said in the decision in this case granting a new trial:

"It required special legislative authority to enable the town to issue bonds in aid of the railroad. Even without what is on the face of these bonds, every person taking them or their coupons is referred to the source of authority to issue them in some statute. A *bona fide* purchaser of them is thus referred, equally with every other taker. There may be no informality or irregularity or fraud or excess of authority in an authorized agent, capable of operating to the prejudice of a *bona fide* holder, but there must be some statute providing for the constitution of authorized agents. Every one is bound to inquire and take notice as to whether there is, in fact, such a statute. If there is not. there is a total want of jurisdiction and authority in county judge and in commissioners." *Marsh* v. *Fulton County*, 10 Wall. 676.

The action of the company, by its resolution of January 29, 1873, in approving the purchase of the Murdock line, and what is called "the action of the president in locating and constructing the western extension of this company's road over and upon the said Murdock line," can have no effect. There is nothing to show that the western extension was ever located over and upon the Murdock line, and such a location was not the required location of the whole branch.

The commissioners paid all of the first coupons on the bonds, and nearly all of the second and third, receiving the money to do so from the supervisor or the collector of the town. The commissioners also received and have retained the certificate of stock. While these acts may be a ratification of steps in regard to which merely irregularity is claimed, they cannot prevail to prevent the town from setting up a total want of power to issue the bonds.

The case is in a worse predicament for the plaintiff than when it was before this court previously. Then it was supposed that the Murdock line and its extension to Freeville might be a part of a west-

ern extension beginning at Auburn, as authorized by the act of 1871. But the present proof shows that this is not so.

There must be a judgment for the defendant, with costs, and a like judgment in the Thomas suit.